**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David CARLSON, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carina LEVERIZA, a/k/a Carina Franz,
a/k/a Karen, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Walter FRANZ, Defendant–Appellant.**

Nos. 93–3456, 94–2662 and 94–2797.

United States Court of Appeals,
Eleventh Circuit.

July 5, 1996.

Brent D. Shore, Tromberg Shore Harrison & Safer, Jacksonville, FL, for David Carlson.

Thomas A. Larkin, Jacksonville, FL, for Carina Leveriza.

Ralph E. Elliott, Jr., Jacksonville, FL, for Walter Franz.

James H. Klindt, Asst. U.S. Atty., Tamra Phipps, Peggy Morris Ronca, Jacksonville, FL, for Appellee in all cases.

Before EDMONDSON and DUBINA, Circuit Judges, and LOGAN *, Senior Circuit Judge.

LOGAN, Senior Circuit Judge:

Defendants David Carlson, Walter A. Franz and Carina Leveriza–Franz (Leveriza) appeal their convictions, and Carlson also appeals his sentence in these consolidated cases. Each pleaded guilty to one count of conspiracy to manufacture and distribute 3,4–Methylenedioxymethamphetamine (MDMA), in violation of 21 U.S.C. §§ 813, 841(a) and 846. All defendants contend that 21 U.S.C. §§ 802(32) and 813 are unconstitutionally vague, and that MDMA was neither validly scheduled as a controlled substance nor as a controlled substance analogue under the Analogue Act, 21 U.S.C. § 813, during the time charged in the indictment. In addition, Carlson argues that the district court improperly denied his collateral attack on the Drug Enforcement Administration (DEA) order of February 1988 scheduling MDMA and erroneously applied the special skill enhancement of the Sentencing Guidelines, USSG § 3B1.3, to increase his sentence. Franz asserts that the government breached his plea agreement by withdrawing its motion for downward departure for substantial assistance.

I

Defendants participated in a large and sophisticated conspiracy for the manufacture and distribution of MDMA.[1] Defendant Leveriza, a chemist, originally worked for Michael Clegg, producing and crystallizing MDMA for sale and distribution. Clegg's laboratory manufactured approximately ten kilograms of MDMA each month. Defendant Franz and Bud Franklin purchased the MDMA lab from Clegg in 1984 and relocated it to Mexico in 1985 when MDMA became illegal in the United States. Because they lacked an effective distribution network Franz and Franklin enlisted Clegg in 1987 to establish MDMA distribution in the United States. Under this arrangement, the Mexican lab produced twenty kilograms of MDMA per month beginning in the fall of 1987. Franz and Franklin shipped the MDMA to California where it was tabulated or poured into capsules for distribution.

In 1988 Clegg decided to expand to Europe. He hired defendant Carlson, another chemist, to manufacture MDMA in Panama to distribute in Europe. After the 1989 U.S. invasion of Panama, Carlson established yet another lab, this time in Brazil. By 1990 Leveriza and Franz had married and moved to Brazil to assist in the MDMA manufacturing process. Carlson left Brazil and moved to California. In 1991, to finance the expan-

---

* Honorable James K. Logan, Senior U.S. Circuit Judge for the Tenth Circuit, sitting by designation.

1. Drug dealers manufactured MDMA in the early 1980s because it affected users in a manner similar to 3,4–methylenedioxyamphetamine (MDA), a Schedule I controlled substance belonging to the amphetamine class, and MDMA was not yet a controlled substance. *Grinspoon v. DEA*, 828 F.2d 881, 894 and n. 12 (1st Cir.1987).

sion of the European market, Franz and Clegg agreed to increase output from the Brazilian lab to fifty kilograms per month. This higher output for a ten-month period completely funded the Brazilian lab and European operation.

When a confidential informant learned of and reported these activities to the DEA, an undercover agent investigated and infiltrated the operation. That investigation led to defendants' arrests and indictments. Defendants pleaded guilty, reserving the right to appeal issues they raised in their motions to dismiss. *See United States v. Franz*, 818 F.Supp. 1478 (M.D.Fla.1993).

## II

We review defendants' contention that the Controlled Substance Analogue Enforcement Act of 1986 (the Analogue Act), 21 U.S.C. § 802(32), is unconstitutionally vague under a de novo standard. *United States v. Trout*, 68 F.3d 1276, 1279 (11th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1032, 134 L.Ed.2d 110 (1996). "Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). We

thus focus on the Analogue Act as applied in the instant cases. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted). Defendants primarily raise the "notice" prong of the vagueness doctrine.

Defendants contend that the phrases "substantially similar" chemical structure and "substantially similar" effect on the central nervous system contained in the definition of a controlled substance analogue are not adequately defined in the Act.[2] They assert they received no fair warning their conduct was illegal and the statute contains no standards for channeling prosecutorial discretion, relying on *United States v. Forbes*, 806 F.Supp. 232 (D.Colo.1992).[3]

The district court properly rejected these contentions, in accord with *United States v. Hofstatter*, 8 F.3d 316 (6th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1101, 127 L.Ed.2d 413 (1994), *United States v. Granberry*, 916 F.2d 1008 (5th Cir.1990), and

---

**2.** Section 802(32) defines a controlled substance analogue as:

(32)(A) Except as provided in subparagraph (B), the term "controlled substance analogue" means a substance—
(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.
(B) Such term does not include—
(i) a controlled substance.
Section 813 provides "A controlled substance analogue shall, to the extent intended for human

consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I."

**3.** *Forbes* is distinguishable from the instant case. It held that the Analogue Act was unconstitutionally vague as applied to alphaethyltryptamine (AET) only. The government conceded in *Forbes* to the lack of scientific consensus that AET's chemical structure compared favorably to that for dimethyultryptamine (DMT) or deithrltryptamine (DET), both Schedule I controlled substances. This conflicting scientific opinion coupled with the absence of a scienter requirement in the Analogue Act, meant persons had to "guess" if their actions were illegal. 806 F.Supp. at 237–38. The instant case involved no disagreement in the scientific evidence that MDMA is substantially similar to MDA. We note that, contrary to defendants' representation, the Tenth Circuit did not affirm the district court's decision on this issue. The circuit decision, 1992 WL 279226, 977 F.2d 596 (10th Cir.1992) (Table), dealt with pretrial release, was issued nearly six weeks before the district court's merits determination, and expressly refused to address the legal status of AET and the constitutionality of the Analogue Act.

*United States v. Desurra*, 865 F.2d 651 (5th Cir.1989). *See United States v. Raymer*, 941 F.2d 1031, 1045–46 (10th Cir.1991) (recognizing MDMA qualified as controlled substance analogue under Analogue Act); *People v. Silver*, 230 Cal.App.3d 389, 394–95, 281 Cal. Rptr. 354 (2 Dist.1991) (upholding California statute that followed language of Analogue Act in prohibiting MDMA).

In *Hofstatter* the Sixth Circuit discussed the use of "substantially similar" in the definition of a "controlled substance analogue" in § 802(32)(A)(i) and found it sufficiently precise. It pointed out that the "intended for human consumption" language of 21 U.S.C. § 813 effectively "discourages arbitrary or discriminatory application of the law," 8 F.3d at 322, because that language allows for legitimate uses (such as growing crystals).

The *Desurra* court examined the procedural background of scheduling MDMA as a controlled substance and as an analogue and concluded that "[t]he legislative history of the Analogue Act makes clear that MDMA is a controlled substance analogue. The DEA's efforts [to schedule it as a controlled substance] if anything, gave [the *Desurra*] defendants additional notice that MDMA was an illicit drug." 865 F.2d at 653.

The defendants here obviously had actual notice that possessing precursor chemicals was prohibited. Franz assisted in moving the lab from California to Mexico in 1985 when MDMA first became illegal in the United States. He and Leveriza set up the lab. They ordered chemicals needed to manufacture precursors of MDMA and to manufacture MDMA. Carlson established labs in both Panama and Brazil. One catalyst for passing the Analogue Act was "the development of MDMA by drug dealers trying to escape regulation of MDA [a Schedule I controlled substance]." *Id.* (citing S.Rep. No. 99–196, 99th Cong., 1st Sess. 2 (1985) and H.R.Rep. No. 99–848, 99th Cong.2d Sess. 4 (1986)). The Analogue Act is not unconstitutionally vague as applied to defendants.

## III

■ Defendants next argue that the DEA did not validly schedule MDMA as a controlled substance. They specifically assert that the DEA should have held additional hearings after *Grinspoon v. DEA*, 828 F.2d 881 (1st Cir.1987), vacated the 1986 final rule originally labeling MDMA a Schedule I controlled substance.

MDMA followed a circuitous path toward Schedule I status. In 1984 the DEA Administrator recommended scheduling MDMA, issuing a notice of proposed rulemaking, and scheduling hearings that began in early 1985. An administrative law judge (ALJ) heard thirty-three witnesses and admitted ninety-five exhibits into evidence over the course of nine days of hearings. He ultimately recommended MDMA for Schedule III status, determining that MDMA had an accepted medical use and safety for use under medical supervision and that the government had not established a high potential for abuse of MDMA. The Administrator rejected that recommendation and placed MDMA on Schedule I,[4] effective November 13, 1986 (the 1986 final rule). 51 Fed.Reg. 36552–01 (1986). The Administrator focused on § 812(b)(1)(B) and (C) and the Food and Drug Administration's (FDA) refusal of new and investigational drug applications for MDMA. Thus, the Administrator concluded that because MDMA could not be marketed legally it lacked both any currently accepted medical use in treatment and accepted safety for use under medical supervision. The Administrator also concluded that MDMA had a high potential for abuse.

*Grinspoon* vacated the 1986 final rule labeling MDMA as a Schedule I controlled substance and remanded the case to the DEA "for further consideration." 828 F.2d at 891. The court held that the Administrator improperly relied on the absence of FDA

---

4. Section 812(b) lists the necessary findings to support a Schedule I label:

  (1) Schedule I.—
    (A) The drug or other substance has a high potential for abuse.

    (B) The drug or other substance has no currently accepted medical use in treatment in the United States.
    (C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

approval to support the findings required by § 812(b)(1)(B) and (C). Shortly thereafter, on January 27, 1988, the DEA deleted MDMA from Schedule I pending the Administrator's reconsideration of the record from the earlier scheduling proceedings and issuance of another final rule.

The Administrator issued another final rule (the 1988 final rule) effective March 23, 1988 placing MDMA on Schedule I. The Administrator relied on the existing hearing record, specifically concluding that it was complete and had provided all interested parties an opportunity to present evidence and brief the issues.

Only the Fifth Circuit has addressed whether the Administrator should have held additional hearings after *Grinspoon*. *United States v. Piaget*, 915 F.2d 138 (5th Cir.1990), denied a challenge to the Administrator's failure to rehear the proposed MDMA scheduling. *Piaget* relied upon the completeness of the existing record and absence of a specific directive in *Grinspoon* to schedule additional hearings. The district court in the instant case followed the *Piaget* holding, and we agree.

The APA hearing requirement may have a variety of meanings adaptable to the circumstances. *Grinspoon* did not identify any evidentiary or procedural deficiencies in the administrative hearing already held; it focused on the absence of FDA approval as the basis for rejecting the Administrator's analysis under § 812(b)(1)(B) and (C). After *Grinspoon* the Administrator reconsidered the evidence and made new findings based upon the hearing record. The 1988 final rule readopted eighteen factual findings the Administrator made in the 1986 final rule, and made thirteen additional findings. Together they dispose of the § 812(b)(1)(B) and (C) issues noted by *Grinspoon* with specific evidentiary findings based on the record.

## IV

■ Count II of the fourth superseding indictment to which defendants pleaded guilty alleges a conspiracy from October 27, 1986 and continuing through February 1993. That allegation states MDMA was a con-trolled substance analogue from October 27, 1986, the effective date of the Analogue Act, until March 22, 1988, and a Schedule I controlled substance after March 23, 1988 (the effective date of the 1988 final rule).

Defendants argue that from November 13, 1986, the effective date of the 1986 final rule later vacated by *Grinspoon*, until January 27, 1988, when the DEA officially withdrew the 1986 final rule (deletion order), 53 Fed.Reg. 2225–02 (1988), MDMA was not a controlled substance analogue because it was labeled a Schedule I controlled substance. The argument is that the subsequent invalidation of both that temporary scheduling order and the 1986 final rule likewise removed MDMA from treatment as an analogue under Schedule I.

The district court found that when *Grinspoon* invalidated MDMA's Schedule I status, MDMA automatically became a controlled substance analogue. In rejecting defendant's assertions it cited *United States v. Raymer*, 941 F.2d 1031 (10th Cir.1991). *Raymer* rejected the argument that the government's failed attempt to label MDMA as a Schedule I controlled substance somehow precluded its treatment as a controlled substance analogue. *Id.* at 1046; *see also United States v. Mitcheltree*, 940 F.2d 1329, 1335–36 (10th Cir.1991) (summarily concluding that MDMA was a controlled substance analogue from October 27, 1986, until March 23, 1988). Reaching the same conclusion, in *Desurra* the Fifth Circuit held that MDA was unquestionably a Schedule I controlled substance and MDMA was a catalyst for passage of the Analogue Act because of its similarity to MDA. Thus, while the DEA was first unsuccessful in scheduling MDMA it necessarily could be treated as a controlled substance analogue after the effective date of the Analogue Act. 865 F.2d at 653.

We agree with our sister circuits. When the First Circuit invalidated the 1986 final rule, MDMA became by operation of law a controlled substance analogue under the plain language of the Analogue Act. That the DEA intended and attempted to have it treated as a Schedule I controlled substance

until the deletion order did not alter the operation of the statute.

## V

■ Defendant Carlson raises three separate arguments to support his collateral attack on the 1988 final rule: (1) the DEA improperly relied upon the lack of FDA approval in scheduling MDMA; (2) it failed to develop a legally acceptable standard for the § 812(b)(1)(B) and (C) criteria; and (3) the record lacks substantial evidence to support the 1988 final rule.

Judicial review of a DEA final rule is governed by 5 U.S.C. §§ 702, 704, 706, and 21 U.S.C. § 877. Section 704 grants judicial review for "[a]gency action made reviewable by statute"; 21 U.S.C. § 877 specifically allows for judicial review of final determinations by the Attorney General "upon petition filed with the court and delivered to the Attorney General within thirty days after notice of the decision." Carlson, however, did not seek judicial review within the allowable time.

■ What Carlson attempts here is to challenge the substantive basis of the agency's ruling that MDMA should be a controlled substance. In *United States v. Guthrie,* 50 F.3d 936, 943–44 (11th Cir.1995), we left open the question whether a defendant could make a collateral attack on a final regulatory decision in a criminal case. We now answer that question by holding that he cannot, for several reasons. First, the decision to schedule a substance like MDMA is a complex matter, as the instant case illustrates. Here the ALJ heard thirty-three witnesses and admitted ninety-five exhibits, and the decision went through at least one layer of administrative review. To retry the agency decision in a criminal case like that before us would introduce a great deal of confusion. Second, and more importantly, the agency itself is not a party in the case; hence, it has no opportunity to defend its scheduling order. The agency record is not before us. The cases that have permitted collateral attacks have involved the validity of a delegation order, *e.g., Touby v. United States,* 500 U.S. 160, 168, 111 S.Ct. 1752, 1757–58, 114 L.Ed.2d 219 (1991), or other purely procedural issues such as compliance with notice requirements of a statute, *e.g., United States v. Caudle,* 828 F.2d 1111, 1113 (5th Cir.1987). This is not such a case. There is an avenue available to seek to overturn the scheduling decision: "[P]roceedings for … amendment, or repeal of such [classification] rules may be initiated by the Attorney General … on the petition of any interested party." 21 U.S.C. § 811(a). Substantive reconsideration cannot be permitted in a criminal prosecution in which the authority that made the classification decision is not a party.

## VI

■ Defendant Carlson challenges the two-level enhancement the court made under USSG § 3B1.3 for his use of special skills. Application note 2 to § 3B1.3 provides: " 'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." We review for clear error a district court's factual findings to support a special skills sentence enhancement. *United States v. Malgoza,* 2 F.3d 1107, 1110 (11th Cir.1993).

We have reviewed the presentence report and other evidence the district court relied on and agree that the government established by a preponderance of the evidence that defendant's special skills as a chemist substantially facilitated the commission of these crimes. The development of a laboratory to produce illegal drugs is a threshold component to a successful illicit drug distribution network. Defendant's skills as a chemist should not be measured in the narrow sense of actual drug production, but whether he applied "a skill not possessed by members of the general public" to significantly facilitate commission of a crime. Defendant's role was to build a turnkey operation from which he and others could immediately supply MDMA. The facts in the instant case are stronger than those in *Malgoza,* where we upheld as warranting a special skills enhancement a defendant's highly

developed radio operation skills that included knowledge of frequencies, equipment and operation.

## VII

■ Defendant Franz argues the government breached his plea agreement to move for a downward departure if he provided substantial assistance, and the district court erred in allowing the withdrawal of the government's pending motion for downward departure. We review for clear error the district court's factual findings regarding the defendant's substantial assistance, *United States v. Gordon*, 19 F.3d 1387, 1388 (11th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 267, 130 L.Ed.2d 185 (1994), and de novo the question of law whether the government breached a plea agreement, *United States v. Garcia–Bonilla*, 11 F.3d 45, 46 (5th Cir. 1993).

Franz' plea agreement contained the standard provisions for cooperation and for the government to make the sole determination whether Franz' assistance warranted a USSG § 5K1.1 motion for a downward departure. The district court had a local practice of requiring substantial assistance motions to be filed at least ten days before sentencing. The government complied with the requirement, addressing in its § 5K1.1 motion that

> defendant provided information that assisted in the indictment of a main MDMA distributor. The defendant also provided information about others involved in this MDMA organization. This motion contemplates that he will be called as a witness in the future before a federal grand jury and/or at a subsequent trial.

> The defendant's substantial assistance is contingent upon him being a viable witness should he be called to testify at a trial or before the grand jury subsequent to the sentencing hearing. Accordingly, the United States reserves its right to withdraw this motion should the defendant perjure himself, obstruct justice, or otherwise attempt to mislead the Court at his sentencing hearing. This type of conduct would prevent the United States from calling him as a witness in the future and

would effectively defeat any assistance has provided to date.

7 R. doc. 570 at 1–2.

After reading this motion, defendant—against the advice of counsel—filed a pro se motion to withdraw his guilty plea. His motion recited assertions of his innocence in the conspiracy to manufacture and distribute MDMA, and the discovery of new and additional evidence establishing his innocence. The district court denied the motion based on defendant's sworn statements during his change of plea hearing and the plea agreement. The district court specifically found that defendant's assertions in his motion to withdraw did not constitute newly discovered evidence.

In response, the government moved to withdraw its § 5K1.1 motion, contending that defendant's motion to withdraw his plea left defendant "worthless as a witness, and the only worth he had to the government was as a witness." 17 R. at 4. In allowing withdrawal of the government motion, the court reiterated its local practice of requiring the filing of substantial assistance motions in advance of sentencing and stated that the government motion placed defendant on notice he should refrain from actions which would damage his appearance as a government witness.

We reject Franz' arguments that the government and the court acted improperly. The broad language of his plea agreement fully communicated to Franz the consequences of his guilty plea. He could not have reasonably understood that the government would accept as substantial assistance less than what it bargained for, including the opportunity to use him as a viable witness.

AFFIRMED.