**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**

**December 13, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**In re D.S., L.J., and K.J.**

**No. 24-606** (Monongalia County 23-JA-130, 23-JA-131, and 24-JA-169)

## MEMORANDUM DECISION

Petitioner, the West Virginia Department of Human Services ("DHS"),[1] appeals the Circuit Court of Monongalia County's October 15, 2024, order declining to adjudicate Respondent T.S. ("Mother") and Respondent B.J. ("Respondent B.J.")[2] (collectively "Respondents") of abusing or neglecting the three children at issue, D.S., L.J., and K.J.[3] On appeal, the DHS argues that the circuit court erred by declining to adjudicate Respondents because (1) the evidence at the adjudicatory hearing established that D.S. suffered non-accidental injuries; and (2) the circuit court improperly ignored the testimony of D.S.'s treating physicians in favor of Respondents' experts who set forth "a novel legal argument . . . that is unsupported by the medical evidence."[4] This Court has held that when scientific expert testimony is proffered, "a circuit court in its 'gatekeeper' role . . . *must* engage in a two-part analysis in regard to the expert testimony." Syl. Pt. 4, in part, *Gentry v. Mangum*, 195 W. Va. 512, 466 S.E.2d 171 (1995) (emphasis added). In performing its gatekeeping function, a circuit court is "required to assess [the] scientific expert testimony

---

[1] Pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services ("DHS").

[2] Respondent B.J. was Mother's boyfriend and a custodian to D.S. during the relevant timeframe at issue. He is the biological father of the other two children at issue, L.J. and K.J. We use initials instead of full names to protect the identities of the juveniles involved in this case. *See* W. Va. R. App. Proc. 40(e).

[3] The DHS is represented by Attorney General Patrick Morrisey, Esq. and Assistant Attorney General Chaelyn W. Casteel, Esq. Respondent Mother is represented by Christine Schneider, Esq. John C. Rogers, Esq. appears on behalf of Respondent B.J. Diane Michael, Esq. appears as the children's guardian ad litem. Intervenors A.S. and C.S. are the maternal grandparents of D.S. They are represented by Jason E. Wingfield, Esq. This Court heard oral argument in this matter on November 20, 2024.

[4] The DHS also asserts that the circuit court erred by failing to hold a dispositional hearing for D.S.'s unknown father after adjudicating him of abandonment.

1

for relevancy and reliability." *Harris v. CSX Transp., Inc.*, 232 W. Va. 617, 621, 753 S.E.2d 275, 279 (2013) (internal quotation omitted). Because the circuit court did not perform this gatekeeping function by making the required findings prior to admitting the expert testimony in this case, we vacate the circuit court's order and remand this matter to the circuit court for further proceedings consistent with our ruling herein. We find that a memorandum decision vacating the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

### Factual and Procedural History[5]

On July 26, 2023, the DHS filed an imminent danger petition alleging that Respondents abused and neglected D.S. and L.J.[6] The petition noted that D.S. was taken to the West Virginia University Children's Hospital Emergency Department on July 16, 2023. Upon arriving at the hospital, D.S. had multiple subdural hematomas and was having seizures. She was intubated and admitted to the pediatric intensive care unit of the hospital. Dr. Amy Gavril, the Chief of the Division of Child Safety and Advocacy at the hospital, consulted regarding the possibility that D.S. had suffered abusive head trauma.[7] Because

---

[5] Because our resolution of this matter turns on a narrow legal issue, we provide an abbreviated recitation of the factual and procedural history of this case.

[6] The identity of D.S.'s biological father is unknown. Thus, an Unknown Father was also named in the petition. L.J. was five years old when this petition was filed. Respondent B.J. is L.J.'s biological father. L.J.'s biological mother, B.D., had custody of L.J. during these proceedings. There were no allegations against B.D. Mother gave birth to K.J. after the petition had been filed but before the proceedings below had concluded. Respondent B.J. is K.J.'s father.

[7] Both "abusive head trauma" and "shaken baby syndrome" were used in reference to D.S.'s injuries during the proceedings in this case. We note that

> there has been some debate regarding use of the name "shaken baby syndrome" [SBS] to describe these head injuries in infants. For example, in 2009 the American Association of Pediatrics urged that the name SBS be changed to "abusive head trauma." They explained that "[a]lthough the term [SBS] is well known and has been used for a number of decades, advances in the understanding of the mechanisms and clinical spectrum of injury associated with abusive head trauma compel us to modify our terminology to keep pace with our understanding of pathologic mechanisms."

2

abusive head trauma was suspected, the DHS was contacted, and an investigation began. Jessica Embry, a Child Protective Services ("CPS") worker, conducted the investigation. Dr. Gavril told Ms. Embry that Mother denied any accidental injuries, family medical history, medical condition, or birth trauma that would explain D.S.'s injuries. Dr. Gavril concluded that D.S.'s injuries were the result of non-accidental trauma "indicative of a shaking motion or whiplash." Respondents reported that D.S. had been sick for about a week and that they sought medical care for D.S. at (1) an urgent care on July 12, 2023; (2) the emergency room at Ruby Memorial Hospital on July 13, 2023; (3) D.S.'s pediatrician on July 14, 2023; and (4) the West Virginia University Children's Hospital Emergency Department on July 16, 2023. During the first three visits, D.S. was examined and discharged without being prescribed any medication or diagnosed with any significant medical issues. Mother also stated that herself, Respondent B.J., and D.S.'s maternal grandparents, Intervenors A.S. and C.S., were D.S.'s caretakers during the week that D.S. was sick.[8] Mother denied that anyone harmed D.S. and stated that she intended to seek a second opinion as to how D.S.'s injuries occurred.

The circuit court held a preliminary hearing on August 10, 2023, and heard testimony from Ms. Embry describing her investigation. Thereafter, the circuit court found probable cause that D.S. was abused or neglected. The adjudicatory hearing was initially scheduled for September 2023, but was rescheduled at Respondents' request to allow them to obtain medical records and retain an expert witness. In October 2023, Mother disclosed an expert witness, Dr. Joseph M. Scheller, who was expected to testify that D.S.'s injuries did not result from "shaken baby syndrome;" rather, his opinion was that there were medical explanations for D.S.'s injuries that did not involve non-accidental trauma. On October 31, 2023, the DHS filed a motion to exclude Dr. Scheller's testimony. The DHS's motion provides:

> The DHHR [now DHS] objects to the expert as the expert would need to rely on scientific knowledge and data. The scientific data and/or rates that Dr. Scheller relies on have not been provided to the State or filed with the Court.
>
> Rule 702 of the West Virginia Rules of Evidence requires the witness to be an expert with scientific, technical, or specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue.

_____

Lauren Quint, *Bridging the Gap: An Application of Social Frameworks Evidence to Shaken Baby Syndrome,* 62 Hastings L.J. 1839, 1869 n. 5 (2011).

[8] Mother's grandparents also briefly watched D.S. during the week that D.S. was sick.

Mother filed a response to this motion on November 15, 2023, arguing that she had provided the DHS with "an adequate description of the expected testimony from Dr. Scheller" in a prior discovery disclosure. Further, Mother asserted that she had complied with Rule 702 of the West Virginia Rules of Evidence ("Rule 702")[9] and that Dr. Scheller was qualified to render an opinion as to how D.S.'s injuries occurred:

> [Mother] has complied with Rule 702 of the West Virginia Rules of Evidence. Providing Dr. Scheller's CV in [Mother's] First Discovery Disclosure shows that Dr. Scheller has training, education and experience in scientific, technical or other special knowledge in the areas of child neurology, electrophysiology, and neuroimaging, among other relevant areas identified in Dr. Scheller's CV.

> [Mother] believes that the Court would anticipate and expect [Mother] to have an expert witness testify and may value the input of more than one doctor to share insight into the issue at hand.

The appendix record does not include a circuit court order ruling on the DHS's motion to exclude Dr. Scheller's testimony. Additionally, in the "Case Docket Entries" log ("docket sheet"), there is no indication that the circuit court entered an order ruling on this motion. We also note that the docket sheet includes the following entry on March 15, 2024: "Resp. [Mother's] Motion in Limine to Excl [sic] State's Experts." The docket sheet provides that the DHS filed a response to this motion on March 18, 2024. The

---

[9] Rule 702 of the West Virginia Rules of Evidence provides:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
> (b) In addition to the requirements in subsection (a), expert testimony based on a novel scientific theory, principle, methodology, or procedure is admissible only if:
>    (1) the testimony is based on sufficient facts or data;
>    (2) the testimony is the product of reliable principles and methods; and
>    (3) the expert has reliably applied the principles and methods to the facts of the case.

4

appendix record does not include a circuit court order ruling on this motion. While it is clear that the circuit court ultimately allowed Dr. Scheller and the DHS's experts to testify during the adjudicatory hearings, the circuit court did not enter an order analyzing whether the parties' expert witnesses satisfied the criteria for admissibility under Rule 702.[10]

The circuit court held six adjudicatory hearings between February and June of 2024. Respondents testified that they did not shake D.S. or commit any physical acts of violence resulting in her injuries. Further, Respondents testified that they repeatedly sought medical care for D.S. during the week that she was sick. The DHS presented expert witness testimony from three of D.S.'s treating physicians: Dr. Gavril, the Chief of the Division of Child Safety and Advocacy at West Virginia University Hospital; Dr. Ryan McGuire, a pediatric ophthalmologist; and Dr. Eyassau Hailemichael, a pediatric radiologist.

Dr. Gavril testified that it was her opinion that D.S. suffered abusive head trauma due to physical abuse that occurred on more than one occasion, most likely due to shaking.[11] Dr. Gavril also testified that (1) only a small minority of medical professionals

_____

[10] During oral argument, none of the parties indicated that the circuit court had entered an order addressing whether the parties' expert witnesses satisfied the criteria for admissibility under Rule 702. We note that Dr. Gavril was called as both a treating physician and an expert witness at the February 26, 2024, adjudicatory hearing. She continued her testimony at the March 19, 2024, adjudicatory hearing. Counsel for Mother objected to Dr. Gavril being qualified as an expert at the February 26, 2024, hearing, asserting that Dr. Gavril had only been disclosed as a fact witness and not as an expert. The circuit court overruled this objection and allowed Dr. Gavril to testify as an expert witness. Mother's motion in limine to exclude the DHS's experts was filed after the February 26th adjudicatory hearing but prior to the March 19th adjudicatory hearing. The circuit court orally denied this motion at the beginning of the March 19th adjudicatory hearing. While it appears that Mother's motion to exclude the DHS's expert witnesses' testimony was based on her contention that these witnesses were not timely disclosed, we emphasize that both parties challenged the admission of the opposing party's expert witnesses and that the circuit court did not enter an order addressing whether the parties' expert witnesses satisfied the criteria for admissibility under Rule 702.

[11] Dr. Gavril stated that D.S. had subdural hematomas "bleeding into the subdual space which is wrapped around both sides of her brain. . . . The blood appeared to have different ages and there are parts of the subdural hematoma that looked like what we call acute, which is new and then other parts that looked as if it was old." She testified that the new blood would be from an injury that occurred within a couple of days of July 16, 2023, when the CT scan was performed. Dr. Gavril also testified that D.S. had retinal bleeding/injuries in both eyes which are highly associated with head injuries. Further, Dr. Gavril testified that she ruled out other possible causes of D.S.'s symptoms including a

dispute the diagnosis of abusive head trauma from shaking and that there is no real debate about the diagnosis in the medical community; and (2) D.S. did not suffer injuries during childbirth, noting that birth-related hematomas resolve within weeks and would not last five months. Dr. McGuire testified that he examined D.S. on July 17, 2023, and that she had preretinal, intraretinal, and subretinal hemorrhages in both eyes. Dr. McGuire's opinion within a reasonable degree of medical certainty was that D.S.'s retinal hemorrhages were caused by abusive head trauma consistent with shaking. Dr. Hailemichael testified that he reviewed D.S.'s CT scan in July 2023 during her hospitalization. He testified that D.S. did not have BESS, stating "[w]hat she had was something called a subdural hemorrhage. The subdural space is another space above the subarachnoid space. So[,] it's a different entity and it doesn't have any relationship with [BESS]."

Respondents called two experts: (1) Dr. Scheller, who was qualified as an expert in pediatrics, child neurology, and neuroimaging; and (2) Dr. Keith Button, a biomechanical engineer who was qualified as an expert in that field. Dr. Scheller opined that D.S. had BESS. He testified that D.S.

> had a chronic condition that caused excess between the brain and the inside of her skull. That caused new bleeding in July when she was a five plus months old and that new bleeding caused the complication of lethargy that brought her into the hospital and . . . that would cause the retinal hemorrhages as well. And because there was no evidence of scalp trauma, skull trauma, brain trauma, neck trauma, bone trauma or external trauma that would make diagnosis of violence much . . . less likely.

---

condition known as Benign Enlargement of Subarachnoid Space ("BESS"). *See* Randy Papetti et al., *Outside the Echo Chamber: A Response to the "Consensus Statement on Abusive Head Trauma in Infants and Young Children*," 59 Santa Clara L. Rev. 299, 347 (2019) ("BESS stands for benign enlargement (or expansion) of the subarachnoid spaces and is a diagnosis known by several other names, including external hydrocephalus, benign subdural effusions, benign extra-cerebral fluid collections, benign subdural hygromas of infancy, as well as other names. This condition, which may include multiple variants, is associated with macrocephaly (an extraordinarily large head) or rapid growth in head circumference. Children with the condition often accumulate excess fluid in the frontal region outside their brain or in the subdural space. The condition arises in the first year of life, is relatively common, and typically resolves over time without neurological damage to the baby, although irritability, vomiting, seizures, and raised intracranial pressure are not uncommon.").

Additionally, Dr. Scheller testified that shaken baby syndrome is not supported by scientific evidence, noting that he was not aware of a scientific study demonstrating that shaking alone, without an impact, could cause the injuries typically associated with abusive head trauma. However, Dr. Scheller conceded that his opinion was the minority view in the medical community and that "the majority of pediatricians and people who work with pediatricians would say, yes, there is such a thing as shaken baby syndrome and shaking is very dangerous and can cause subdural hematomas in babies."

Dr. Button, the biomechanical engineering expert, testified that (1) biomechanical literature has not demonstrated that shaking alone, without impact, can produce the necessary angular head acceleration to cause acute subdural bleeding; (2) if D.S. had been violently shaken, there would have been injuries to her cervical spine prior to any closed head injury; (3) D.S.'s injuries are more consistent with direct head impact resulting from a fall when compared with violent shaking; and (4) short height falls can result in significant and sometimes fatal injuries to children.

On October 15, 2024, the circuit court entered a lengthy order concluding that the DHS did not establish that Respondents abused or neglected D.S.[12] The circuit court found Respondents' testimony that they did not physically abuse D.S. to be credible, noting that D.S. did not have any external injuries and that Respondents sought medical care for D.S. four times in five days. Further, the circuit court determined that "there are substantial questions as to the legitimacy of a diagnosis of 'abusive head trauma' where there is no sign of blunt force trauma." The circuit court relied on *State v. Nieves*, 302 A.3d 595, 621 (N.J. 2023), in which the court found that "the lack of biomechanical support renders the theory [shaken baby syndrome] scientifically unreliable, notwithstanding its support in the pediatric community." Relying on *Nieves*, as well as the testimony of Dr. Scheller and Dr. Button, the circuit court concluded that "acceleration/deceleration forces alone, without blunt force trauma, has not been established by the scientific community to a degree of scientific certainty to cause either retinal hemorrhages or subdermal [sic] hematomas." Based on the foregoing, the circuit court dismissed the petition and ordered the immediate return of D.S. to the legal and physical custody of Mother. It also ordered that Respondent B.J.'s "legal and physical custody rights" to L.J. be returned and that any

---

[12] According to the DHS, the circuit court entered a one page "Order of Dismissal" on August 19, 2024, finding that the allegations of abuse and/or neglect "have not been substantiated to a clear and convincing standard against [Respondents] and hereby Dismisses this matter." It appears that this order was subsequently held in abeyance and later vacated before the court entered its October 15, 2024, order.

prior agreements between Respondent B.J. and L.J.'s mother, B.D., "related to custody of the child are hereby reinstated."[13]

The DHS now appeals the circuit court's October 15, 2024, adjudicatory order.

## Standard of Review

In this case, we are asked to review the circuit court's order dismissing the abuse and neglect petition against Respondents. We have held:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

## Discussion

On appeal, the DHS's primary argument is that the circuit court erred in failing to find that Respondents were abusing and neglectful parents/custodians and that

---

[13] On October 9, 2024, a preliminary hearing was held regarding a third amended petition filed by the DHS that named Respondents' recently born child, K.J. This child was born in August of 2024, after the adjudicatory hearings had concluded but prior to the circuit court entering its adjudicatory order. An "Order Following Preliminary Hearing on Third Amendment to Petition" was entered on October 15, 2024, finding that because the circuit court concluded that D.S. was not abused and/or neglected, there was no probable cause to find that K.J. was abused and/or neglected. Therefore, the circuit court returned custody of K.J. to Respondents and dismissed the case.

8

the children were abused because (1) the evidence at the adjudicatory hearing established that D.S. suffered non-accidental injuries; and (2) the circuit court improperly ignored the testimony of D.S.'s treating physicians in favor of Respondents' experts who set forth "a novel legal argument . . . that is unsupported by the medical evidence."  The crux of the DHS's argument is that the circuit court improperly weighed the complex medical and scientific evidence based on the testimony of the parties' experts.  As explained below, we find that we cannot meaningfully assess this argument because the circuit court did not perform its required gatekeeping function prior to admitting the parties' experts' testimony.  Therefore, we vacate the circuit court's order and remand this matter with directions for the circuit court to conduct this analysis in accord with Rule 702 and our well-established caselaw addressing Rule 702.

The admissibility of expert testimony is governed by Rule 702 of the West Virginia Rules of Evidence.  This Court has determined that Rule 702 imposes a "gatekeeper" duty upon circuit courts to screen scientific expert opinions to ensure that they are relevant and based upon reliable methodologies. *See Wilt v. Buracker*, 191 W. Va. 39, 443 S.E.2d 196 (1993); *Gentry v. Mangum*, 195 W. Va. 512, 466 S.E.2d 171.  We have explained that circuit courts "must conduct a two-part inquiry under Rule 702 and ask: (1) is the witness [qualified as] an expert; and, if so, (2) is the expert's testimony relevant and reliable?" *San Francisco v. Wendy's Int'l, Inc.*, 221 W. Va. 734, 741, 656 S.E.2d 485, 492 (2007) (citations omitted).  Under the first prong of this inquiry, whether a witness is qualified as an expert, this Court has held:

> In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify.

Syl. Pt. 5, *Gentry*, 195 W. Va. 512, 466 S.E.2d 171.

Under the second prong, whether an expert's testimony is relevant and reliable, we have held:

> In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard

9

to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

Syl. Pt. 2, *Wilt*, 191 W. Va. 39, 443 S.E.2d 196.[14]

This Court emphasized in *Gentry* that

---

[14] After *Wilt* was decided, this Court noted that additional factors may be considered when assessing whether an expert's testimony is reliable:

[the *Wilt*] factors are by no means a definitive checklist or test of reliability. Other courts have developed additional factors, such as whether the scientific theory "was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 687 (8th Cir.2001) (citations omitted). Sometimes, a theory first appears in court because of "(a) the inability to publish in a peer review journal because of industry control, (b) the testimony is not novel and therefore of little publication interest, [or] (c) the topic is of little general interest." Larry E. Coben, Crashworthiness Litigation, § 24:4 [1998]. A court may treat an expert's qualifications as circumstantial evidence that he or she has used a scientifically valid methodology or mode of reasoning in drawing his or her conclusions. *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C.Cir.1996). In sum, regardless of what other factors a court considers, an expert's opinion is still reliable and admissible if "the expert explains precisely how the conclusions were reached and points to an objective source to show that his or her conclusions are based on a scientific method used by at least a minority of scientists in the field." Coben, Crashworthiness Litigation.

*San Francisco v. Wendy's Int'l, Inc.*, 221 W. Va. at 742, 656 S.E.2d at 493.

[u]nder *Daubert/Wilt*, the circuit court conducts an inquiry into the validity of the underlying science, looking at the soundness of the principles or theories and the reliability of the process or method as applied in the case. The problem is not to decide whether the proffered evidence is right, but whether the science is valid enough to be reliable.

*Gentry*, 195 W. Va. at 523, 466 S.E.2d at 182.

Similarly, in addressing the "reliability" analysis, this Court has explained that

[t]he assessment of whether scientifically-based expert testimony is "reliable," as that term is used in [*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993)], does not mean an assessment of whether the testimony is persuasive, convincing, or well-founded. Rather, assessing "reliability" is a shorthand term of art for assessing whether the testimony is to a reasonable degree based on the use of knowledge and procedures that have been arrived at using the methods of science—rather than being based on irrational and intuitive feelings, guesses, or speculation.

*In re Flood Litig.*, 222 W. Va. 574, 582 n. 5, 668 S.E.2d 203, 211 n. 5 (2008).

The instant case involves five expert witnesses addressing complex issues relating to abusive head trauma across a number of different disciplines and specialties including pediatrics, radiology, ophthalmology, and biomechanical engineering.[15] Expert

---

[15] In syllabus points four and six of *Gentry*, this Court explained:

When scientific evidence is proffered, a circuit court in its "gatekeeper" role under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), cert. denied, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), must engage in a two-part analysis in regard to the expert testimony. First, the circuit court must determine whether the expert testimony reflects scientific knowledge, whether the findings are derived by scientific

11

witness challenges were made by both Mother and the DHS. However, the circuit court did not enter an order addressing whether each expert satisfied the admissibility requirements of Rule 702 pursuant to the caselaw outlined above. It is not this Court's role to perform the gatekeeping function assigned to circuit courts. As one appellate court outside of our jurisdiction recognized, "[r]ather than becoming the gatekeeper, our function is to determine whether the actual gatekeeper, the trial judge, has abused his discretion in performing that role in a particular case." *Clark v. State*, 315 So. 3d 987, 995 (Miss. 2021). Because the circuit court did not make the required Rule 702 findings prior to admitting the expert witnesses' testimony in this case, this Court is not in a position to properly assess the DHS's argument that the circuit court erred by disregarding the testimony of D.S.'s treating physicians in favor of the testimony of Respondents' experts who, according to the DHS, set forth "a novel legal argument . . . that is unsupported by the medical evidence."

As demonstrated by the parties' arguments, the key inquiry is whether each expert's testimony satisfies the reliability prong of Rule 702. The circuit court must analyze this question and make detailed findings on this issue pursuant to the factors this Court has outlined. *See* Syl. Pt. 2, *Harris v. CSX Transp., Inc.*, 232 W. Va. 617, 753 S.E.2d 275 ("When a trial court is called upon to determine the admissibility of scientific expert testimony, in deciding the 'reliability' prong of admissibility the focus of the trial court's inquiry is limited to determining whether the expert employed a methodology that is recognized in the scientific community for rendering an opinion on the subject under

> method, and whether the work product amounts to good science. Second, the circuit court must ensure that the scientific testimony is relevant to the task at hand.
>
> The question of admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), cert. denied, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994) only arises if it is first established that the testimony deals with "scientific knowledge." "Scientific" implies a grounding in the methods and procedures of science while "knowledge" connotes more than subjective belief or unsupported speculation. In order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. It is the circuit court's responsibility initially to determine whether the expert's proposed testimony amounts to "scientific knowledge" and, in doing so, to analyze not what the experts say, but what basis they have for saying it.

Syl. Pts. 4 and 6, *Gentry*, 195 W. Va. 512, 466 S.E.2d 171.

consideration. If the methodology is recognized in the scientific community, the court should then determine whether the expert correctly applied the methodology to render his or her opinion. If these two factors are satisfied, and the testimony has been found to be relevant, and the expert is qualified, the expert may testify at trial.").[16]

Based on the foregoing, we vacate the circuit court's October 15, 2024, order and remand this matter with directions for the circuit court to thoroughly analyze and address whether the parties' expert witnesses satisfy the criteria for admission under Rule 702.[17]  The Clerk of Court is directed to issue the mandate forthwith.

Vacated and Remanded.

**ISSUED:** December 13, 2024

**CONCURRED IN BY:**
Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice C. Haley Bunn

**Dissenting:**
Justice William R. Wooton

---

[16] *See also* Syl. Pt. 2, *Wilt*, 191 W. Va. 39, 443 S.E.2d 196; Syl. Pts. 4, 5, and 6, *Gentry*, 195 W. Va. 512, 466 S.E.2d 171; and *San Francisco v. Wendy's Int'l, Inc.*, 221 W. Va. at 742, 656 S.E.2d at 493.

[17] The DHS also argued that the circuit court erred by failing to hold a dispositional hearing for D.S.'s unknown father after adjudicating him of abandonment. Because we vacate the circuit court's October 15, 2024, order and remand this matter for further proceedings, we decline to address this issue.  Upon remand, the parties may address this issue with the circuit court.  Further, because the entry of a new adjudicatory order will necessarily depend on the circuit court's Rule 702 analysis, we leave it to the circuit court and to the parties to determine the scope of additional proceedings that will be necessary upon remand.  Finally, we note that when the DHS filed its notice of appeal on October 16, 2024, it also filed a motion to stay the circuit court's adjudicatory order. This Court deferred ruling on the motion to stay.  Because we have now vacated the circuit court's adjudicatory order, we find that the motion to stay is moot.

13

WOOTON, Justice, dissenting:

Despite the circuit court's entry of an excruciatingly detailed 41-page analysis of both the pertinent facts and the scientific methodology underlying the competing experts' opinions in this matter, the majority inexplicably remands for insufficiency of the order. Further, it does so on grounds raised neither below nor on appeal by DHS: Nowhere in the six appellate briefs or nearly 1,000 pages of hearing transcript do the words "*Daubert*"[1] or reference to its progeny appear. At no time did DHS or the guardian ad litem ("GAL") request a *Daubert* hearing with regard to respondents' experts, ask a single question in voir dire, or object to respondents' experts' testimony on *Daubert* grounds. More importantly, however, the majority's remand is utterly pointless. The circuit court unequivocally concluded that DHS failed to prove that either respondent was guilty of abuse or neglect—even assuming any occurred. Therefore, regardless of any additional "findings" the circuit court offers this Court regarding the experts (which will presumably be the same as those already laid out in its extensive order), it will again decline to adjudicate, and the parties will no doubt shortly return to this Court in the same posture and with the same arguments. Because remand of this already protracted proceeding exacerbates the existing turmoil for the subject children and affected parties, I dissent.

As indicated, the majority's decision—focused exclusively on the expert testimony below—overlooks the entirely dispositive aspect of the circuit court's order that survives remand regardless of the competing expert opinions. Irrespective of the circuit court's conclusions regarding the nature of D.S.'s alleged injuries, it has nonetheless already found that there was no evidence that either respondent caused or failed to protect against them. The circuit court's order frames the issue presented as whether D.S. suffered "abusive head trauma *at the hands of [T.S.] and/or [B.J.]*" and plainly concludes that "DHS has failed to establish by clear and convincing evidence that [D.S.] was abused and/or neglected *by [T.S. or B.J.]*." (Emphasis added). This finding operates independently of whether D.S. was abused or neglected, as prescribed by statute. West Virginia Code § 49-4-601(i) requires an adjudicating court to determine "whether the child is abused or neglected *and* whether the *respondent* is abusing[] [or] neglecting[.]") (emphasis added). The absence of either element is fatal to adjudication. The circuit court's order contains pages upon pages of discussion regarding the absence of clear and convincing evidence that either respondent was individually culpable for any alleged abuse or neglect.

---

[1] Although not heavily cited directly in the majority's opinion, its resolution requires the circuit court to utilize the analysis outlined in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and adopted by this Court in *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993) (frequently referred to as "*Daubert/Wilt*" in our caselaw). It "provides a method for assessing a proffer of expert scientific testimony[]" in order to weed out "'junk science.'" *Gentry v. Mangum*, 195 W. Va. 512, 526, 466 S.E.2d 171, 185 (1995).

14

Specifically, the order finds that each respondent credibly denied causing or knowing of any injury to D.S.; further, the order painstakingly details each witness's testimony regarding the potential culpability of respondents. The order discusses that the assigned social worker believed T.S. "responded appropriately[]" to D.S.'s alleged injuries, found no prior evidence that she "was not a good caregiver," and that T.S. had no "warning signs" regarding B.J.'s caregiving. The order recounts "credible" testimony from A.S., T.S.'s stepmother, that B.J. "had never been anything but appropriate" with D.S. and that T.S. was a "good mother." The court summarized the testimony of respondents, noting that as to T.S., "[t]he [c]ourt found [her] testimony to be quite credible," without "hesitation on these issues," and that her "demeanor [was] appropriate for the circumstances." Likewise, with respect to B.J., the court "found [B.J.'s] testimony to be quite credible[,]" without hesitation or "explanations[.]" The circuit court thoroughly examined respondents' behavior and motivations, comparing all of the witnesses' testimony and ultimately concluded that neither respondent demonstrated "'consciousness of guilt[,]'" but rather "just the opposite[.]" The court further found respondents' relentless efforts to obtain medical treatment inconsistent with abuse or knowledge of abuse. Ultimately, the circuit court found that "both respondents were clear and convincing in their testimonial denials and also in their actions[,]" that neither "acted as one would have expected in the event of abuse or neglect[,]" and that their "actions are consistent with innocence and inconsistent with guilt."

Moreover, rather than simply declaring respondents credible, the circuit court carefully assessed the timeline of events and D.S.'s symptoms, coming to the obvious conclusion that—contrary to DHS's contention—D.S. was not in the exclusive custody of respondents during the applicable time frame such as to make them responsible for her condition. The court determined that the timeline of events demonstrated that in addition to respondents, D.S. was admittedly frequently in the care of or exposed to others who could have committed acts of abuse or negligent care. D.S. was often in the care of T.S.'s father and stepmother during the days before and during her symptoms, in the unsupervised care of T.S.'s grandparents, and exposed to three additional children in the home of T.S.'s father and stepmother—the latter of whom were never interviewed by DHS or called as witnesses, as specifically noted by the circuit court. In view of respondents' credibility—both in demeanor and conduct—the court noted that there were a myriad of other possibilities for D.S.'s condition and declined to "speculat[e] as to what did occur[.]" The circuit court emphasized that "DHS failed to establish that these [r]espondents were the only ones possible to have mishandled [D.S.]" and ultimately concluded that "the argument that the child was in the exclusive control of the [r]espondents at the time that the injury had to have been incurred is not consistent and is not persuasive combined with the other testimony in this matter."

The foregoing notwithstanding, the majority's remand for more "findings" and "analysis" relative to the experts defies both logic and relevant caselaw. First, no party made a *Daubert* challenge to Dr. Scheller's or Dr. Button's opinions below (or even on

15

appeal); therefore, any such challenge is waived.[2]  *See* W.V.R.E. 103 ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and[] . . . a party, on the record[] . . . timely objects or moves to strike[.]").  This requirement applies equally to *Daubert* challenges.  *See United States v. Diaz*, 300 F.3d 66, 74 (1st Cir. 2002) ("[L]itigants must raise a timely objection to the validity or reliability of expert testimony under *Daubert* in order to preserve a challenge on appeal to the admissibility of that evidence."); *Callahan*, 756 F. App'x at 223 ("Appellants did not object on *Daubert* grounds before or during trial nor did they request a *Daubert* hearing. Appellants did not even mention *Daubert*, Federal Rule of Evidence 702, or any form of the word 'reliability' in any objection at trial."); 29 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Evid.* § 6270 (2d ed.) ("Objections under Rule 702 must conform to the requirements of Rule 103 to be preserved for appeal." (footnote omitted)). In fact, federal courts have observed specifically that "[w]hen no objection is raised, district

---

[2] When respondents moved for their respective experts' qualification, the court asked DHS and the guardian ad litem if they had "any voir dire or any objection" to which they both responded in the negative.

Nevertheless, in an attempt to overcome the obvious waiver of any *Daubert* objection, the majority vaguely insists that the parties "challenged the admission of the opposing party's expert witnesses[.]"  However, the majority acknowledges that respondent mother's challenge was limited to lack of timeliness.  Likewise, it is clear that DHS's motion to exclude was limited to a simple disclosure issue that the circuit court appears to have resolved in its December 20, 2023, order.  More specifically, DHS's motion complained of the lack of a report from Dr. Scheller and sought his exclusion because "[t]he scientific data and/or rates that Dr. Scheller relies on have not been provided to the State or filed with the Court."  Accordingly—and contrary to the majority's suggestion—the circuit court's December 20, 2023, order reflects that on November 28, 2023, the court took up this motion and respondent mother's counsel "proffered regarding what Dr. Scheller would be testifying."  The court then ruled that respondent mother was "ORDERED . . . to provide a summary regarding Dr. Scheller's testimony."  The order contains no objection to this ruling.

More importantly, respondent mother *assigns no error* to this ruling nor does any party make any further mention of it.  *See Callahan v. Pac. Cycle, Inc.*, 756 F. App'x 216, 223 (4th Cir. 2018) (finding that "hinting at the reliability of an expert's testimony is not sufficient to preserve a *Daubert* argument for appeal.").  Obviously, DHS's motion merely sought a rudimentary discovery disclosure—far from a *Daubert*-based reliability challenge.  DHS appears to have neither filed a supplemental motion upon receipt of the court-ordered disclosure, nor offered any objection to either expert's reliability on *Daubert* grounds—despite producing as part of its pre-hearing discovery a litany of cases challenging Dr. Scheller's opinions on precisely such basis.

courts are not required to make 'explicit on-the-record [*Daubert*] rulings' and, 'we assume that the district court consistently and continually performed a trustworthiness analysis sub silentio of all evidence introduced at trial.'" *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 n.2 (10th Cir. 2000) (quoting *Hoult v. Hoult*, 57 F.3d 1, 5 (1st Cir.1995)).[3]   In this case however, given the extensive questioning of *each* expert's scientific methodology—particularly by the circuit court itself—and the resulting order, the whole of the underlying proceedings could be fairly characterized as a *Daubert* hearing and ruling.

In that regard, perhaps the most inexplicable aspect of the majority's decision is its demand for more "detailed findings" by the circuit court.  First, it is patently obvious that the circuit court found Dr. Scheller's and Dr. Button's opinions reliable under even the most rigorous Rule 702 analysis—as demonstrated by its wholesale adoption of their opinions laid forth upon nearly every page of the 41-page order.  It will undoubtedly do so again.  However, it is impossible to discern what more the circuit court could possibly say about the experts' opinions or scientific method that is not already exhaustively discussed in its order.  The order dedicates the overwhelming majority of its pages to dissecting each expert's testimony, opinion, underlying methodology and testing, peer and publication support, and, most importantly, the court's thinking regarding the reliability and weight of the scientific methodologies employed.  It is well understood that a court "need not 'recite the *Daubert* standard as though it were some magical incantation,' . . . or apply all of the reliability factors[.]" *Goebel*, 215 F.3d at 1088 (citations omitted).  This is particularly true where the court not only admits the testimony but as the *finder of fact* relies upon those opinions.  As this Court counseled in *San Francisco v. Wendy's Int'l, Inc.*, "an expert's opinion is still reliable and admissible if 'the expert explains precisely how the conclusions were reached and points to an objective source to show that his or her conclusions are based on a scientific method used by at least a minority of scientists in the field.'"  221 W. Va. 734, 742, 656 S.E.2d 485, 493 (2007) (citation omitted).

What no doubt troubles the majority is the circuit court's acceptance of what it has characterized as a "novel" scientific theory.  However, Dr. Scheller's and Dr.

_____

[3] Further, it is well-understood that courts sitting as both gatekeeper and fact-finder receive evidence for both purposes contemporaneously. *See City of Owensboro v. Adams*, 136 S.W.3d 446, 451 (Ky. 2004) ("[I]n a bench trial, the trial court, without a *Daubert* hearing, will often admit the evidence first and then disregard it upon deciding that it is unreliable."). *See also United States v. Brown*, 279 F. Supp.2d 1238, 1243 (S.D. Ala. 2003) ("'[D]istrict courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements' of Rule 702." (citation omitted)); *Berry v. Sch. Dist.*, 195 F. Supp.2d 971, 977 n.3 (W.D. Mich. 2002) ("A court sitting as trier of fact frequently will allow the testimony to be heard, then will disregard that evidence which is inadmissible[.]").

17

Button's opinions reflect an *emerging* criticism of shaken baby syndrome—a criticism recently acknowledged by the United States Supreme Court. *See Roberson v. Texas*, No. 24-5753, 2024 WL 4521766, at *1-3 (U.S. Oct. 17, 2024) (statement of Justice Sotomayor respecting the denial of certiorari)) (discussing cases suggesting that "the science underlying the shaken baby syndrome diagnosis ha[s] since been discredited[]" on the basis of "'twenty years of reputable scientific evidence that contradicts [shaken baby syndrome].'"). As even a cursory review of the order on appeal reveals, the circuit court carefully explained that DHS's experts' opinions had the benefit of being widely accepted but were subject to attack due to lack of testing and diagnostic criteria. And while respondents' experts' opinions reflected a minority viewpoint, they were supported by biomechanical principles and testing. *Both* sets of opinions were challenged as to their scientific reliability, yet *both* offered reasonable methodologies upon which they were based. *Accord State v. Nieves,* 302 A.3d 595, 599 (N.J. Super. Ct. App. Div. 2023) (affirming lower court's exclusion of expert testimony of shaken baby syndrome due to "real dispute in the larger medical and scientific community about the validity of shaking only [shaken baby syndrome/abusive head trauma] theory, despite its seeming acceptance in the pediatric medical community.").

As a result, the circuit court was not obligated to accept the "majority" scientific position where it found respondents' experts' challenge to that position equally reliable and more persuasive. In fact, this Court has made clear that *Daubert* does not operate to exclude experts who "present a novel, yet well grounded, conclusion that should be resolved by the trier of fact." *Gentry*, 195 W. Va. at 527, 466 S.E.2d at 186. To that end, the circuit court's consideration and acceptance of respondents' experts' opinions was both an evidentiary ruling and factual determination—both of which are entitled to deference irrespective of the majority's misgivings. *See* Syl. Pt. 6, *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991) ("The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.") and Syl. Pt. 1, in part, *In re Tiffany Marie S*., 196 W. Va. 223, 470 S.E.2d 177 (1996) ("[A] reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.").

In addition to not being well-founded, the majority's resolution threatens two important principles in abuse and neglect proceedings: consistency and finality. First, the majority remands despite most of its members having affirmed a circuit court's refusal to adjudicate in a nearly identical situation mere months ago. In *In re L.B.-1*, a majority of this Court affirmed the circuit court's determination that DHS failed in its burden where a pre-verbal infant who was exposed to multiple caregivers—all of whom denied injuring the child—suffered *undisputed* abuse. No. 22-906, 2024 WL 2793695 (W. Va. May 30, 2024) (memorandum decision). Like the instant case, the circuit court found the presence of multiple caregivers and the absence of any evidence that respondent was "'anything less

18

than an appropriate caregiver,'" or that she "'failed to act appropriately in any way[]'" fatal to adjudicating her as abusive. *Id*. at *6. We affirmed and concluded that, even where abuse is undisputed, to adjudicate a respondent parent "in absence of any clear and convincing evidence satisfying the statutory definition—would effectively require her to prove she did *not* abuse L.B.-2." *Id*. at *7. Unlike *In re L.B.-1*, where there was undisputed evidence of abuse, the instant case—with disputed scientific evidence as to whether any abuse actually occurred—presents even more compelling reasons to affirm. If nothing else, this Court should strive to maintain consistency in its treatment of respondent parents.

Finally, and most importantly, the much-needed finality to these already protracted proceedings is threatened by remand. The circuit judge below, who avidly listened and actively participated in six hearings consisting of highly technical, detailed testimony, will soon be replaced by his successor. Even if additional "findings" are somehow generated which would satisfy the majority, any subsequent appeal of that ruling will no doubt exceed his tenure and leave the parties with the threat of remand to a stranger to the proceedings. The overarching goal of abuse and neglect proceedings is to provide permanency and stability for children. The achievement of this goal requires expediency and finality, both of which are thwarted when—as in this case—this Court requires additional, unnecessary "findings" which obtain the same result, and thus do nothing more than prolong the proceedings. For this reason, I respectfully dissent.